UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

EDGARDO RODRIGUEZ,

        Petitioner,

    vs.

KIM HOLLAND, Warden,

        Respondent.

Case No:  C 11-00935 SBA

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

     Petitioner Edgardo Rodriguez was convicted following a jury trial in the Alameda County Superior Court of first degree murder and weapons charges, and sentenced to life in prison without the possibility of parole.  Through counsel, Petitioner has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Having read and considered the papers submitted, and being fully informed, the Court DENIES the petition.

## I.    BACKGROUND

### A.    STATEMENT OF THE CASE

     Petitioner and co-defendants Bryan Giddings ("Giddings"), Manuel Robles ("Robles"), and Omar Anwar ("Anwar"), were charged with the shootings of Francisco Javier Sanchez ("Sanchez") and Osvaldo Ramirez ("Ramirez").  Ramirez survived, but Sanchez did not.  After initially pleading not guilty, Giddings, Robles, and Anwar entered pleas of no contest or guilty to aiding and abetting an assault by defendant with a semiautomatic firearm in violation of Penal Code § 245(b), which the prosecution specified was a "stipulated lesser-related" offense to the charged offense of shooting at an occupied motor vehicle.  People v. Rodriguez, No. A114910, 2009 WL 2993822, *1 (Cal. Ct App. Sept. 21, 2009) (unpublished disposition).

The California Court of Appeal summarized the case against Petitioner, as follows:

### 1. The Shooting

On the afternoon of September 16, 2003, Sanchez was driving his brother's red or maroon car on Mission Boulevard in Hayward, with his friend Ramirez seated in the front passenger seat. Sanchez and Ramirez, who were members of the Laborers Union, had just paid their union dues at a union hall on Mission and were driving toward a supermarket. Sanchez and Ramirez were not involved in gang activity. Sanchez stopped at a red light at the intersection of Mission and Industrial. A white minivan stopped in the left turn lane next to the driver's side of Sanchez's car. Ramirez later identified a photograph of Bryan Giddings's white minivan as the van that stopped next to Sanchez's car. Ramirez testified that a man got out of the back of the van and reached his hand into the driver's side window of Sanchez's car. Ramirez then heard several gunshots. After the first shot, Ramirez felt pain in his leg and ducked down. Sanchez's car rolled forward into the intersection and came to a stop. When Ramirez looked up, he saw that Sanchez was bleeding and had several wounds, including a head wound. Sanchez died of bullet wounds to his head, left shoulder, and right forearm.

Stephanie Koller and her teenage son Kyle were driving on Mission and stopped at the intersection of Industrial at about 3 p.m. on September 16, 2003, in the same southbound lane as Sanchez's car, and two cars behind it. Stephanie saw the white minivan pass her car and stop in the left turn lane next to Sanchez's car. Stephanie then saw a man get out of the van, approach Sanchez's car, and throw two punches at the driver through the open driver's side window. Kyle also saw the man standing in the street between the white minivan and the maroon car. Kyle then saw a man's right hand and arm come out of the open front passenger's side window of the white minivan, holding a gun that Kyle recognized as a semiautomatic weapon. The man holding the gun pointed it at the driver's side of the maroon car and fired six or seven shots. Stephanie also heard several gunshots. Based on the skin color of the shooter's arm, Kyle believed the shooter was Hispanic. Kyle believed that the man holding the gun out of the window was not the driver of the van, because the driver would not be able to lean over far enough to stick his forearm out of the passenger side window.

Kyle and Stephanie testified that, when the gunshots began, the man standing in the street between the van and Sanchez's car appeared to be startled by the shots. The man in the street jumped back, put his hands in front of his face and turned his head as if he were trying to get out of the way. When the shooting stopped, the white van began making a U-turn on Mission, stopped briefly to let the man in the street run to get into the van, and then continued the U-turn and drove away northbound on Mission. When the van stopped in the middle of its U-turn to let the man in the street get in, Kyle and Stephanie saw the driver of the van. Kyle and Stephanie also noticed the first digit of the

van's license plate number. Stephanie called her husband, a Hayward police officer, and gave descriptions of the driver of the van and the man who got out of the van and threw punches at Sanchez. At trial, Stephanie and Kyle both identified Giddings's white minivan as the van involved in the shooting.

The parties stipulated that Ranil Bhukhan, if called as a witness, would testify that he was driving on Mission at the intersection of Industrial on September 16, 2003, at approximately 3 p.m., witnessed a shooting, saw a white van make a U-turn, and wrote down the van's license plate number on a paper bag. The number Bhukhan wrote down was the license plate number of Giddings's van.

Giddings, Robles, and Anwar testified that, on September 16, 2003, they were gang members. Giddings was involved with the VSH (Vario South Hayward) and DGF (Don't Give a Fuck) gangs, which are affiliated with the South Side Hayward gang, which in turn is a Norteño gang. Robles and Anwar were DGF gang members. Giddings, Robles, and Anwar testified that defendant was also a DGF gang member on September 16, 2003. Members of Norteño gangs such as South Side Hayward and DGF view Sureño gangs as their enemies and will attack persons they believe to be Sureño gang members. Norteño gang members use the derogatory term "Scraps" to refer to Sureño gang members.

On September 16, 2003, Giddings drove his white minivan, with defendant seated in the front passenger seat, to pick up Robles. Robles testified that, when Giddings and defendant picked him up at his mother's home, Giddings was driving, defendant was seated in the front passenger seat, and Robles got into the back seat.

Robles's sister, Anna Robles Ramirez (Anna), testified that at around 2:30 p.m. on September 16, 2003, Giddings and defendant arrived at Anna's mother's home (where Anna was then living) in Giddings's van. Anna saw Robles get into the rear sliding door of the van and, as the van pulled away, she saw that Giddings was driving and defendant was seated in the front passenger seat.

Giddings next drove the van to an area called Ranker Court and picked up Anwar, who got into the back seat of the van. The group drove around for a while listening to music, drinking beer, and smoking marijuana, and then arrived at the intersection of Mission and Industrial. During the drive, the group talked about problems they had been having recently with "Scraps" and spoke about wanting to beat up or "smash" a "Scrap." Giddings testified that, during this conversation, defendant said "I want to get me a Scrap." Giddings testified that, prior to arriving at Mission and Industrial, he was not aware that anyone in the van had a gun, although he always assumed it was possible that one of his fellow gang members might have a gun. Anwar testified that he was not aware that defendant had a gun before the van arrived at Mission and

Industrial. Robles had seen a gun in defendant's pocket earlier in the day.

The three codefendants all testified that, when the van arrived at Mission and Industrial, Giddings was driving, defendant was in the front passenger seat, Robles was in the back seat behind Giddings, and Anwar was in the back seat behind defendant. Giddings stopped at the red light in the lane to the left of the maroon car driven by Sanchez. The occupants of the van noticed that there were two young Hispanic men in the car and that the driver (Sanchez) was wearing a baby blue University of North Carolina baseball cap. Sureños claim the color blue, and Norteños claim the color red.

Giddings and Anwar testified that defendant said "There goes a Scrap" or something similar. Defendant told Anwar to get out of the van and confront or punch the driver of the maroon car. Anwar testified that when defendant told him to get out of the van, defendant had taken out a gun and was waving it at Anwar. Giddings, Robles, and Anwar testified that they did not believe the men in the maroon car were Sureños, because they did not present themselves the way gang members do, and because the driver (Sanchez) smiled at Giddings. However, Anwar got out of the van, approached the maroon car, and said "No Sureño." When Sanchez did not respond, Anwar threw a punch at Sanchez but missed. Sanchez did not fight back and appeared to not know how to react. Giddings started yelling at Anwar to get back in the van.

The three codefendants testified that defendant then started shooting at the driver of the maroon car. Robles ducked down onto the floor of the van. Anwar was startled by the gunshots, moved back and put his hands up near his face. Giddings was afraid of being caught and yelled at defendant, "What the fuck you doing? What you doing, doing that shit right here for?" Giddings began making a U-turn to leave the scene, but defendant told him to stop and wait for Anwar to get back in the van. Defendant yelled at Giddings, saying "Stop, stop. Wait for [Anwar] to get in. Don't fuck up now." By then, defendant had the gun on his lap pointing in Giddings's direction. Giddings stopped the van; Anwar got in; and Giddings drove away.

Giddings drove the van to defendant's apartment, where the group stayed for between a half hour and 45 minutes. Defendant showered and changed his clothes, and Anwar changed his shirt. One or more of the men suggested that defendant urinate on his hands to remove the gunpowder residue. At the apartment, Anwar saw the gun that defendant apparently had used.

The group left the apartment in Giddings's van. This time, Robles drove; Giddings sat in the front passenger seat; Anwar sat in the back seat behind the driver; and defendant sat in the rear, passenger-side seat.

### 2. The Arrest

The police had been given a description and license plate number of the van and were looking for it. Hayward Police Lieutenant Thomas Perry spotted the van and began following it, and Robles pulled the van into the parking lot of a pizza restaurant. Other officers arrived and arrested the four occupants of the van.

Stephanie and Kyle Koller arrived at the scene of the arrest and identified Giddings as the driver of the van at the time of the shooting and Anwar as the man who was standing in the street between the van and Sanchez's car.

Officer Donald Jenkins obtained identifying information from defendant at the scene. A crowd of spectators had gathered. Officer Jenkins noticed a group of eight to ten Hispanic males, two of whom Jenkins recognized as gang members, standing together and looking at the suspects who were being arrested. Jenkins pointed out the group to other officers, and the group then ran behind a building.

### 3. The Search of Defendant's Apartment

On the day after the shooting, police officers, including Inspector Robert Coffey, searched defendant's apartment pursuant to a warrant. A window next to the door of the apartment had been broken. Clothing and other items were strewn around the apartment, and there was no bedding on the bed. Based on his observations, Inspector Coffey opined that someone had broken the window and entered and ransacked the apartment. In the apartment police found a box of .22 caliber long rifle ammunition, 13 rounds of .38 caliber ammunition, and an empty box of Winchester brand 9-millimeter Luger ammunition. Police also found several items of red clothing in the apartment, the color claimed by Norteño gang members.

### 4. Ballistics Evidence

Joseph Fabiny, a firearms expert, testified that he tested the six shell casings found at the scene of the shooting. The casings included four Winchester brand 9-millimeter Luger casings, one Speer brand 9-millimeter Luger casing, and one PMC brand 9-millimeter Luger casing, all of which had been fired from the same gun.

Rodriguez, 2009 WL 2993822, *2-5.

### B.   PROCEDURAL HISTORY

Petitioner was tried by a jury in the Alameda County Superior Court.  On April 3, 2006, the jury found Petitioner guilty of first degree murder with special circumstances in

violation of California Penal Code[1] §§ 187(a), 190.2(a)(21) & 190.2(a)(22); shooting at an occupied motor vehicle in violation of Penal Code § 246; and attempted murder in violation of Penal Code §§ 187(a) & 664.  Ex. 1 at 1358-1361.  The jury also found true the special circumstances as to count one (first degree murder) and all enhancement allegations relating the aforementioned charges.  On August 9, 2006, the court sentenced Petitioner to life in prison without possibility of parole on the first degree murder charge, plus additional consecutive terms on count three and certain of the enhancement allegations.  Ex. 1 at 1399-1402.

On November 26, 2008, the California Court of Appeal affirmed the judgment in a decision certified for partial publication.  Ex. 7; People v. Rodriguez, 168 Cal. App. 4th 972 (2008), vacated by 202 P.3d 1088 (2009).  Petitioner filed a petition for review.  Ex. 8.  On March 11, 2009, the California Supreme Court granted review and transferred the matter to the California Court of Appeal with directions to vacate its decision and reconsider the matter in light of People v. Avila, 38 Cal.4th 491 (2006).  Ex. 9.

On September 21, 2009, the California Court of Appeal affirmed the judgment in an unpublished, reasoned decision. Ex. 12.

Petitioner filed a petition for rehearing, which was denied on October 13, 2009.  Exs. 13 & 14.  In addition, Petitioner filed a petition for review in the California Supreme Court which was denied on December 2, 2009.  Exs. 15 & 16.

Thereafter, Petitioner filed the instant Petition for Writ of Habeas Corpus ("Petition") in this Court.  He alleges three due process claims:  (1) failure to instruct the jury that three witnesses were accomplices; (2) improper admission of evidence of other crimes; and (3) erroneous admission of certain expert testimony.  Respondent has answered the Petition and Petitioner has filed a traverse.  The matter is fully briefed and ripe for adjudication.

---

[1] Unless otherwise noted, all further statutory references are to the California Penal Code.

**1**  II.      **STANDARD OF REVIEW**

**2**           The instant Petition is governed by the Antiterrorism and Effective Death Penalty

**3**  Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Under AEDPA, a federal court cannot grant

**4**  habeas relief with respect to any claim adjudicated on the merits in a state-court proceeding

**5**  unless:  (1) the proceeding "resulted in a decision that was contrary to, or involved an

**6**  unreasonable application of, clearly established Federal law, as determined by the Supreme

**7**  Court of the United States"; or (2) "resulted in a decision that was based on an

**8**  unreasonable determination of the facts in light of the evidence presented in the State court

**9**  proceeding."  28 U.S.C. § 2254(d)(1), (2).

**10**          The first prong of § 2254 applies both to questions of law and to mixed questions of

**11**  law and fact.  See Williams (Terry) v. Taylor, 529 U.S. 362, 407-409 (2000).  A state court

**12**  decision is "contrary to" clearly established federal law "if the state court applies a rule that

**13**  contradicts the governing law set forth in [Supreme Court] cases or if the state court

**14**  confronts a set of facts that are materially indistinguishable from a decision of [the

**15**  Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Lockyer

**16**  v. Andrade, 538 U.S. 63, 73 (2003) (internal quotation marks omitted).  "When there is no

**17**  clearly established federal law on an issue, a state court cannot be said to have

**18**  unreasonably applied the law as to that issue."  Holley v. Yarborough, 568 F.3d 1091, 1098

**19**  (9th Cir. 2009) (citing Carey v. Musladin, 549 U.S. 70, 76-77 (2006)).

**20**          Relief under the "unreasonable application" clause is appropriate "if the state court

**21**  identifies the correct governing legal principle from [the Supreme] Court's decisions but

**22**  unreasonably applies that principle to the facts of the prisoner's case."  Id.  The federal

**23**  court on habeas review may not issue the writ "simply because that court concludes in its

**24**  independent judgment that the relevant state-court decision applied clearly established

**25**  federal law erroneously or incorrectly."  Williams (Terry), 529 U.S. at 411.  Rather, the

**26**  petitioner must show that the application of Supreme Court law was "objectively

**27**  unreasonable."  Id. at 409; Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam).

**28**

The second prong of § 2254 applies to decisions based on factual determinations. See Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  Miller-El, 537 U.S. at 340; see also Torres v. Prunty, 223 F.3d 1103, 1107 (9th Cir. 2000).

In determining whether a state court's decision is contrary to, or involves an unreasonable application of, clearly established federal law, courts in this Circuit look to the decision of the highest state court to address the merits of the petitioner's claim in a reasoned decision.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-804 (1991); LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."  Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  See Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). The last reasoned decision in this case is the California Court of Appeal's unpublished disposition issued on September 29, 2009.

## III.   **DISCUSSION**

### A.   PRELIMINARY ISSUES

Respondent contends, as an initial matter, that the Petition fails to comport with Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254 ("Habeas Rule 2(c)").  Under Habeas Rule 2(c), the petition must state sufficient facts "that point to a real possibility of constitutional error" along with the "relationship of the facts to the claim asserted."  Mayle v. Felix, 545 U.S. 644, 655 (2005)

(emphasis added).  The remedy for a deficiently pled habeas petition is dismissal with leave to amend.  See Blackledge v. Allison, 431 U.S. 63, 74 (1977); Jarvis v. Nelson, 440 F.2d 13, 14 (9th Cir. 1971).

In the instant case, each claim of the Petition is set forth in a brief heading, followed by a lengthy verbatim recitation of background facts from the Court of Appeal's unpublished decision.  Pet. at 3-12.[2]  The Petition, however, makes no effort to demonstrate the relationship of those facts to each claim.  Nor does it present any reasoning, analysis, or argument demonstrating that the state appellate court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented.

Tellingly, Petitioner does not respond to Respondent's contention that the Petition fails to comport with Habeas Rule 2(c).  Instead, Petitioner filed a lengthy, nineteen-page traverse, which, for the first time, presents extensive arguments in support of his claims.  This approach to briefing is wholly inappropriate and prejudicial, as it unfairly deprives Respondent of the opportunity to respond to arguments that should have been presented in the petition in the first instance.  See Mishler v. Clift, 191 F.3d 998, 1009 n.8 (9th Cir. 1999) (declining to consider even a purely legal argument raised for the first time in a movant's reply brief, since doing so would prejudice the nonmovants by depriving them of the opportunity to respond); see also Delgadillo v. Woodford, 527 F.3d 919, 930 n.4 (9th Cir. 2008) (holding that it is improper to raise new arguments in a traverse).  Consequently, the new arguments presented in Petitioner's traverse are deemed waived and need not be considered.  Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007).  That aside, even

---

[2] For instance, the heading for Claim One states:  "The court deprived petitioner of his right to a jury trial and federal due process by refusing to instruct the jury that three witnesses were accomplices as a matter of law, and by failing to instruct on the natural and probable consequences doctrine."  Pet. at 3.

considering the traverse on the merits, as will be discussed below, the Court finds no merit to any of the claims and supporting arguments advanced by Petitioner.[3]

**B.   INSTRUCTIONAL ERROR**

**1.   Background**

Petitioner requested that the trial court instruct the jury (pursuant to CALCRIM No. 335) that co-defendants Giddings, Robles, and Anwar, were, as a matter of law, accomplices whose testimony required corroboration.  The court declined this request on the ground that the question of whether the co-defendants were accomplices was a disputed factual issue to be resolved by the jury.  Instead, the court indicated that it would instruct the jury on this issue by using CALCRIM No. 334, which explains, in substance, that a witness is an accomplice to a crime if he personally commits the crime or aids and abets its commission, i.e., aids in the commission of the crime with knowledge of "the criminal purpose of the person who committed the crime."

In response, Petitioner asserted that if the trial court were to submit the accomplice question to the jury, it should also give an instruction explaining the natural and probable consequences doctrine of aiding and abetting liability.[4]  Petitioner submitted a proposed instruction (based on CALCRIM No. 402) stating that the three co-defendants had pled guilty or no contest to assault with a semiautomatic firearm and that if the crimes charged against defendant were natural and probable consequences of that assault, the three witnesses should be deemed to be accomplices to the charged crimes.  Petitioner further

---

[3] Although the Petition is subject to dismissal for failure to comport with Habeas Rule 2(c), Respondent did not file a motion to dismiss, but instead answered the Petition on the merits.  Because this matter is now fully briefed and the state court record has been filed, the Court will reach the merits of the Petition.

[4] Under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also for any other offense that was a natural and probable consequence of the crime aided and abetted.  People v. Chiu, 59 Cal.4th 155, 164-65 (2014).  This doctrine would have provided Petitioner with an alternative means to establish that Giddings, Robles, and Anwar were accomplices.  People v. Bryant, — Cal. 4th —, 2014 WL 4197804, *60 (Cal. Sup. Ct., Aug. 25, 2014).

argued that "some natural and probable consequences doctrine instruction" should be given to the jury as part of the court's instructions on accomplice testimony.  The trial court declined that request and stated that neither CALCRIM No. 402 nor Petitioner's modified version of the instruction was necessary.

In a reasoned decision, the state court of appeal considered and rejected Petitioner's claim of instructional error.  The court held that an instruction stating that the co-defendants were accomplices as a matter of law was unwarranted given the disputed factual record. Rodriguez, 2009 WL 2993822, *10.  With regard to the failure to instruct on the natural and probable consequences doctrine, the state appellate court found that the trial court erred by failing to give the instruction but that the error was harmless.  Id.

### 2.    Analysis

Claims of error in state jury instructions are generally a matter of state law and do not typically present an issue of constitutional magnitude.  Gilmore v. Taylor, 508 U.S. 333, 342-43 (1993); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some [constitutional right].") (internal quotations omitted).  To obtain federal habeas relief based on instructional error, the petitioner must demonstrate "that an erroneous instruction so infected the entire trial that the resulting conviction violates due process."  Id.  In making its determination, the Court must evaluate the challenged jury instructions "in the context of the overall charge to the jury as a component of the entire trial process."  Prantil v. Cal., 843 F.2d 314, 317 (9th Cir. 1988) (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).

Petitioner contends that "the trial court arbitrarily denied [him] his state-created entitlement to the protection of Penal Code section 1111 by refusing to instruct the jury that Giddings, Robles and Anwar were accomplices as a matter of law using CALCRIM 335, and then compounded that denial by refusing to instruct the jury on the natural and probable consequences doctrine under CALCRIM 402, . . ."  Traverse at 8.  Penal Code § 1111 provides that "a defendant cannot be convicted of a crime on the basis of an

accomplice's testimony unless that testimony is corroborated by other evidence connecting the defendant with the commission of the charged offense." Id.  An accomplice is defined as a person "who is liable to prosecution for the identical offense charged against the defendant on trial . . . ." Id.  "Whether someone is an accomplice is ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law." Bryant, — Cal.4th at __,  2014 WL 4197804, *58 (internal quotations and citation omitted).

With regard to the trial court's refusal to give an accomplice as a matter of law instruction, the state appellate court held that such decision was appropriate in view of the factual disputes presented. Rodriguez, 2009 WL 2993822, *10.  Specifically, the court found that "[t]here were factual disputes as to whether they aided and abetted the 'identical' offenses charged against defendant, i.e., the murder of Sanchez, shooting at an occupied motor vehicle, and the attempted murder of Osvaldo Ramirez." Id.  The court also noted that evidence showing that the co-defendants were present at the scene of the shooting and failed to prevent it, assisted Petitioner in his efforts to escape, or that they were originally prosecuted for the same offenses as Petitioner, did "not establish aiding and abetting liability." Id., *11.  Finally, the state appellate court rejected the notion that the co-defendants were accomplices as a matter of law under the natural and probable consequences doctrine, finding that "[w]hether a particular criminal act (a nontarget crime) was a natural and probable consequence of another criminal act (the target crime) is a factual question to be resolved by the jury." Id., *12.

In the instant proceeding, Petitioner has failed to demonstrate that the state appellate court's determination that the issue of whether the co-defendants were accomplices for purposes of Penal Code § 1111 was properly submitted to the jury for its determination justifies relief under § 2254(d).  Although Petitioner claims that there was sufficient evidence to demonstrate that the co-defendants were, in fact, accomplices, Petitioner fails to show that the evidence was undisputed or amenable to only one inference.  See People v.

1   Brown, 31 Cal.4th 518, 556-557 (2003) ("Whether a person is an accomplice within the

2   meaning of section 1111 presents a factual question for the jury 'unless the evidence

3   permits only a single inference.'") (citation omitted).  In any event, this Court is bound by

4   the state appellate court's determination regarding the necessity of an instruction.

5   Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (holding that a state court's interpretation of

6   state law, including one announced on direct appeal of the challenged conviction, binds a

7   federal court on habeas review); e.g., Romero v. Cal. Dept. of Corrections and

8   Rehabilitation, 405 Fed. Appx. 208, 211, 2010 WL 5030089, *2 (9th Cir. Sept. 3, 2010)

9   ("The California Court of Appeal's conclusion that the instructions were adequate as a

10   matter of state law binds us.") (citing Bradshaw, 546 U.S. at 76); Gonzalez v. Gonzalez,

11   394 Fed. Appx. 415, 2010 WL 3468609, *1 (9th Cir. Sept. 3, 2010) ("The California Court

12   of Appeal's conclusion that there was no instructional error is a binding interpretation of

13   state law.").

14        As to the trial court's failure to give an instruction on the natural and probable

15   causes doctrine, the state appellate court held that this was erroneous because the

16   prosecution relied on the testimony of potential accomplices to prove Petitioner's guilt.

17   Rodriguez, 2009 WL 2993822, *13.  However, the state appellate court explained that

18   under California law, a failure to instruct on accomplice testimony is harmless if there is

19   sufficient corroborating evidence in the record.  Id. *14 (citing People v. Frye, 18 Cal.4th

20   894, 966 (1998) and People v. Miranda, 44 Cal.3d 57, 100 (1987), disapproved on another

21   point in People v. Marshall, 50 Cal.3d 907, 933, n.4 (1990)).  After extensively discussing

22   the corroborating testimony presented at trial, the state appellate court concluded that "there

23   is sufficient corroborating evidence connecting defendant with commission of the charged

24   crimes." Id., *15.

25        Petitioner argues that the trial court's failure to give a natural and probable causes

26   instruction deprived him of his rights under Penal Code § 1111 and was prejudicial because

27   the only substantial evidence identifying him as the shooter was provided by the co-

28   defendants, who allegedly had a motive to lie in order to avoid criminal liability.  Traverse

at 8.  The Ninth Circuit has held that "[a]s a state statutory rule, and to the extent that the uncorroborated testimony is not 'incredible or insubstantial on its face,' the rule [of California Penal Code § 1111] is not required by the Constitution or federal law."  Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000); accord In re Mitchell P., 22 Cal.3d 946, 949 (1978) (stating that § 1111's corroboration requirement is an independent state law that is "not constitutionally based."); Redding v. Minn., 881 F.2d 575, 578 (8th Cir. 1989) (holding that a corroboration requirement "is a matter of state law which does not implicate a constitutional right cognizable on habeas review").  Petitioner has made no showing that the co-defendants' testimony was facially incredible or unsubstantial.  As a result, Petitioner has not presented a claim of constitutional magnitude.  See United States v. Lopez, 803 F.2d 969, 973 (9th Cir. 1986) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face.").

The above notwithstanding, the state appellate court correctly found that the prosecution had presented sufficient corroborating evidence at trial, consistent with Penal Code § 1111.  Several independent witnesses testified that the van driven by co-defendant Giddings was at the scene of the shootings, and one eyewitness in particular testified that the shots were fired by the person sitting in the front passenger seat of the van driven by Giddings.  Evidence was presented that the surviving victim, Ramirez, identified Petitioner as one of the individuals present in the van.  A search of Petitioner's apartment uncovered an empty box of Winchester brand 9 millimeter Luger ammunition, and four Winchester brand 9-millimeter casings, all fired from the same gun.  Petitioner argues that this evidence is insufficient to corroborate the testimony of his co-defendants.  Traverse at 8.  However, corroborative evidence "'need not corroborate every fact to which the accomplice testified or establish the corpus delicti, but is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'"  Laboa, 224 F.3d at 979 (emphasis added, citation omitted).  The Court finds that the corroborative evidence presented at trial connected Petitioner to the shootings.  See Alcantara v. Rackley,

554 Fed. Appx. 674, 674-75 (9th Cir. May 14, 2014) (finding that accomplice testimony was adequately corroborated by circumstantial evidence of defendant's involvement in the murder); United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993) (holding that testimony that the defendant was present in the room where a cooler with the cash was found and that a "moneyman" would be present at the drug deal was sufficient to corroborate an accomplice's testimony).

The Court concludes that the trial court's failure to give the accomplice instructions requested by Petitioner did not deprive him of his right to a fundamentally fair trial. See Estelle, 502 U.S. at 72-73. Nor did it have a substantial and injurious effect or influence in determining the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 638 (1993); Pulido v. Chrones, 629 F.3d 1007, 1012 (2010). Accordingly, the Court DENIES relief on Claim One.

## C.    ADMISSION OF PRIOR ACT EVIDENCE

### 1.    Background

Co-defendants Giddings and Robles testified that a few days before the murder of Sanchez, they and Petitioner were driving in the Meekland neighborhood of Hayward when they saw a Hispanic man wearing blue clothing walking down the street. Rodriguez, 2009 WL 2993822, *5. Petitioner believed the man was a Sureño gang member. Id. Giddings made a U-turn and drove up next to the man, and defendant fired shots at him.

Prior to trial, Petitioner unsuccessfully made a motion in limine to exclude evidence of the Meekland shooting. Id. Relying on California Evidence Code § 1101(b), the trial court ruled that evidence of the shooting was admissible for the limited purposes of proving Petitioner's motive, intent, and premeditation and deliberation in connection with the Mission shooting, including proving that the defendant committed the Mission shooting for the benefit of a criminal street gang, as alleged in the special circumstance and sentence

enhancement allegations.  Id.[5]  After the close of evidence, the trial court read a limiting instruction to the jury that it could only consider evidence of the Meekland shooting for purposes of determining whether Petitioner had the requisite intent, a motive, or a plan or scheme in connection with the Mission shooting.  Id.

On appeal, Petitioner alleged that the admission of evidence of the Meekland shooting constituted reversible error.  In rejecting this claim, the state appellate court noted that the admissibility of evidence of other crimes depend on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.  Id., *6.  The court analyzed these factors as follows:

> Applying the three factors listed above, the trial court did not abuse its discretion in admitting evidence about the Meekland shooting. First, the facts that the evidence was admitted to prove, i.e., defendant's motive, intent, and premeditation or plan in connection with the Mission shooting, were material issues in the case. . . . The information charged, and the prosecution had to prove, that defendant intended to kill Sanchez and Ramirez, that the shooting was willful, deliberate and premeditated, and that defendant carried out the crimes for the benefit of a criminal street gang and with the specific intent to promote the activities of the gang.
>
> *   *   *
>
> As to the second factor governing admissibility of other crimes evidence, testimony about the Meekland shooting was probative of defendant's motive, intent, and premeditation or plan in connection with the Mission shooting. . . .  Here, the Meekland and Mission shootings were very similar.  In both instances, defendant was driving around with fellow Norteño gang members, saw people that he perceived to be Sureño gang members, and shot at them. Evidence of the Meekland shooting thus tended to prove that defendant's shooting of Sanchez and Ramirez was intentional and premeditated, rather than accidental or random.
>
> *   *   *

---

[5] Evidence Code § 1101(b) states:  "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

The third factor governing the admissibility of other crimes evidence is whether the evidence should be excluded pursuant to an exclusionary rule such as Evidence Code section 352. . .

The trial court here did not abuse its discretion in declining to exclude evidence of the Meekland shooting under Evidence Code section 352. Although evidence of other crimes always poses some risk of prejudice . . . , the risk of prejudice was not unusually grave here. The Meekland evidence was no more inflammatory than the evidence about the charged crimes, so it was unlikely that the Meekland evidence inflamed the jury's passions or led the jury to convict defendant based on that evidence. . . . The testimony about the Meekland shooting did not consume very much time or dominate the trial testimony. It was confined to a short series of questions to Giddings and Robles. The trial court instructed the jury on the limited purposes for which it could consider the evidence of the Meekland shooting, which reduced the risk of prejudice. . . .

Rodriguez, 2009 WL 2993822, *6-8.

### 2.    Analysis

Petitioner claims that "[t]he court deprived [him] of his federal right to due process by admitting evidence of other crimes even though there were no permissible inferences the jury might draw from the evidence." Pet. at 10. This claim lacks merit. A claim based on the admission of allegedly prejudicial evidence does not present a violation of clearly established federal law as required for habeas relief under AEDPA. Holley, 568 F.3d at 1101 (finding that the Supreme Court has not yet clearly ruled that the admission of irrelevant or overtly prejudicial evidence constitutes a due process violation). Absent "clearly established federal law," a federal court evaluating a habeas claim cannot conclude that a state court's admission of evidence was contrary to, or unreasonably applied, Supreme Court precedent. Wright v. Van Patten, 552 U.S. 120, 126 (2008). That aside, the state appellate court's determination that evidence relating to the Meekland shooting was admissible under state law; i.e., California Evidence Code § 1101(b), is binding in a federal habeas action. Bradshaw, 546 U.S. at 76; Hicks v. Feiock, 485 U.S. 624, 629 (1988) (holding that a determination of state law made by an intermediate appellate court must be followed).

The Court further finds that the admission of evidence relating to the Meekland shooting did not deprive Petitioner of his right to a fair trial. Habeas relief is only available if the error had a "substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice." Brecht, 507 U.S. at 637. At trial, significant evidence of Petitioner's guilt was presented. See discussion, supra. Importantly, the jury was instructed that it could consider evidence of uncharged conduct solely for the purpose of determining the Petitioner's intent, motive or plan. Ex. 1 at 1306-1307; Ex. 2 at 2531. Juries are presumed to follow their instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000). In light of the evidence of guilt and limiting instructions given, any error in admitting evidence of the Meekland shooting could not have had a substantial and injurious effect on the jury's verdict.

The Court concludes that Petitioner has failed to state any basis for habeas relief based on the erroneous admission of evidence, and therefore, DENIES relief on Claim Two.

**D.   ADMISSION OF EXPERT TESTIMONY**

**1.   Background**

At trial, Hayward Police Inspector John Lage ("Inspector Lage") testified as an expert on criminal street gangs; in particular, the Hispanic Norteño and Sureño gangs active in southern Alameda County. Rodriguez, 2009 WL 2993822, *15. Inspector Lage opined that, at the time of the incident, Petitioner was an active member in a subset of the Norteño gang, known as the South Side Hayward/DGF gang. Id. He based this opinion on information gleaned from the case and other sources, including Petitioner's admissions and criminal record and information received from other police officers, school officials, and gang members. Id. Inspector Lage also opined that Giddings, Robles, and Anwar were active gang members on the date of the incident, and that Petitioner had previously associated with Giddings and Robles. Id.

Inspector Lage testified that Norteño gang members view Sureño gang members, whom they derogatorily refer to as "scrap," as enemies and actively seek them out. Id. In

response to hypothetical questions based on the facts of the attack on Sanchez and Ramirez, Inspector Lage responded that the crime:  (1) was committed for the benefit of, at the direction of, or in association with members of the South Side Hayward/DGF gang and with the specific intent to promote, further, or assist in criminal conduct by members of the gang; and (2) was carried out to further the activities of the gang.  Id.  He did not testify regarding Petitioner's specific intent to commit the crimes.  Id.

On appeal, Petitioner argued that the trial court erred in allowing Inspector Lage to testify as to an ultimate issue, i.e., that Petitioner's motives for committing the offense was related to his gang affiliation.  Id., *17.  The state appellate court rejected this contention, noting that "[e]xpert opinion testimony about criminal street gangs that is otherwise admissible is not made inadmissible because it encompasses the ultimate issues in the case" and that "courts have frequently permitted expert testimony about whether there was a gang-related motive for a particular crime."  Id. (citing cases).  Citing People v. Killebrew, 103 Cal. App. 4th 644, 657 (2002), the court noted that the only limitation on an expert's gang testimony is that he may not testify that an individual had specific knowledge or possessed a specific intent.  Id.  The court found that Inspector Lage's testimony did not contravene that limitation, as he merely testified "in response to hypothetical questions based on the facts of this case."  Id.

The state appellate court also rejected Petitioner's contention that the trial court erred in permitting Inspector Lage to testify about certain hearsay statements and other matters he considered in forming his opinions.  Id.  The court summarized the disputed testimony as follows:

> Defendant identifies five portions of Inspector Lage's testimony that he claims were improperly admitted, four of which relate to information that Inspector Lage described when testifying about the bases for his opinion that defendant was an active DGF gang member on September 16, 2003. Inspector Lage testified that his opinion on this issue was based, among many other things, on the following: (1) an Officer Stanley told Lage that in 2000 defendant was with a known DGF gang member at a liquor store frequented by gang members and admitted to Stanley that he hung out with the gang member; (2) an Officer Snell told Lage that on May 1, 2003 he stopped defendant and Anwar in an area frequented by gang members and concluded

that both defendant and Anwar were gang-affiliated;
(3) Margaret McCullum, a school administrator at Tennyson
High School, told Lage that defendant was affiliated with the
South Side Hayward gang at the school; (4) in January 2006,
defendant was involved in a gang-related fight at Santa Rita jail,
which Lage learned about through an investigation that
included speaking to witnesses and participants and reading
reports prepared by sheriff's deputies. The fifth portion of
testimony that defendant challenges as improper hearsay relates
to Inspector Lage's testimony that when a gang member is
arrested for a serious crime, fellow gang members frequently
seek to help the arrested gang member avoid prosecution by
destroying or concealing evidence. Inspector Lage testified that
this opinion was based on his own investigations of gang-
related crimes, as well as the statements of gang members and
other police officers.

Rodriguez, 2009 WL 2993882, *19.

Petitioner argued that permitting Inspector Lage to testify regarding hearsay statements was improper and violated his rights under the federal Confrontation Clause. The state court of appeal rejected this claim, finding that "[a]n expert witness may offer opinion testimony based on material that is not otherwise admissible, including hearsay, as long as the material is of a type that is reasonably relied upon by experts in the particular field in forming their opinions." Id. Nevertheless, to ensure that the jury did not construe the hearsay statements as evidence, the trial court instructed the jury categorically that all statements recounted by Inspector Lage as bases for his opinions could be considered only to evaluate Lage's opinions and could not be considered for the truth of the information in the underlying statements. Id. The appellate panel concluded "that this instruction at the end of the trial was sufficient to guide the jurors as to the proper uses of the evidence." Id.[6]

---

[6] In his traverse, Petitioner argues that the trial court's instructions were "conflicting rather than careful jury instructions." Traverse at 12. Setting aside that this claim is unexhausted, Petitioner fails to raise it in his petition. Claim Three alleges only that the trial court's decision to allow the expert to rely on hearsay deprived him of due process and the right to confront witnesses, not that the trial court's instruction was erroneous or confused the jury. The Court find that this claim is not properly before the it. Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (court has discretion to refuse to consider claim raised for first time in traverse). But even if it were, Petitioner has made no showing that any of the trial court's instructions denied him a fair trial.

With respect to Petitioner's ancillary Confrontation Clause claim, the state court of appeal held that he waived such argument by failing to interpose an objection on that ground during trial.  In the alternative, the court found that even if the claim were not waived, "an expert's description of the material upon which his or her opinions are based, including hearsay statements, does not violate the confrontation clause because it is offered not for the truth of the underlying statements but to enable the jury to assess the bases for the expert's opinion."  Id.

### 2.   Analysis

#### a)   *Testimony Relating to Ultimate Issues*

Petitioner alleges that "the court deprived [him] of his right to federal due process and his right to confront by allowing an expert to rely on unreliable hearsay testimony on the ultimate issues in the case, including whether motives for crimes were gang-related." Pet. at 11.  This claim lacks merit.  As an initial matter, Petitioner cannot establish that the state appellate court's decision is contrary to or is an unreasonable application of clearly established Supreme Court law.  See Briceno v. Scribner, 555 F.3d 1069, 1077-78 (9th Cir. 2009) (rejecting habeas claim that expert testimony regarding gang-related nature of crimes unconstitutionally pertained to ultimate issue for jury, because "there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue"). Moreover, the Ninth Circuit has consistently held that allowing an expert to provide gang-related testimony does not offend due process.   Moses v. Payne, 555 F.3d 742, 761 (9th Cir. 2009) (rejecting the suggestion that "the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact."); Windham v. Merkle, 163 F.3d 1092, 1103-104 (9th Cir. 1998) (finding no due process violation in admission of "gang expert" testimony which was relevant to prosecution theory of petitioner's motive for presence and participation in crimes which led to murder by

accomplice).[7]  While it is true than an expert cannot testify about a defendant's personal motive underlying his criminal conduct, the state appellate court found that Inspector Lage did not offer any such testimony, and permissibly responded to hypothetical questions.  As noted, this Court is bound by that determination.  See Bradshaw, 546 U.S. at 76.

### b)    *Reliance on Hearsay*

Nor is there any merit to Petitioner's ancillary claim that it was improper for the trial court to allow Inspector Lage to testify regarding the hearsay statements he relied upon as the basis for certain of his opinions.  "California law permits gang experts to rely on reliable hearsay evidence to form an opinion, even if the evidence would otherwise be inadmissible."  People v. Valadez, 220 Cal. App. 4th 16, 29 (2013).  "Expert testimony is admissible to establish the existence, composition, culture, habits, and activities of street gangs; a defendant's membership in a gang; gang rivalries; the 'motivation for a particular crime, generally retaliation or intimidation'; and 'whether and how a crime was committed to benefit or promote a gang.'"  People v. Hill, 191 Cal. App. 4th 1104, 1120 (2011) (citation omitted).  The same is true under federal law.  See United States v. Hankey, 203 F.3d 1160, 1168-70 (9th Cir. 2000) (holding that gang expert could rely on his law enforcement experience investigating gangs and "street intelligence" in forming his "opinions about gang membership and tenets"); see also Fed. R. Evid. 703; United States v. McCollum, 732 F.2d 1419, 1422-23 (9th Cir. 1984) (applying Rule 703 to affirm the admission of expert testimony based on hearsay).

The state court of appeal held that it was permissible under state law for Inspector Lage to rely on hearsay evidence in forming his opinions.  Rodriguez, 2009 WL 2993822, *6-8.  A state court's interpretation of state law is binding on federal habeas review.  Hicks, 485 U.S. at 629-30 n.3.  In addition, the Court notes that the trial court, while initially

---

[7] Likewise, under state law, the fact that an expert's testimony may have touched upon an ultimate issue in the case, including defendant's motive, does not violate due process.  See People v. Valdez, 58 Cal. App. 4th 494, 508-509 (1997) (finding trial court properly admitted expert witness' opinion that individual participants in gang-related shooting acted for the benefit of a gang).

1  rejecting Petitioner's trial counsel's request for a limiting instruction, later instructed the

2  jury that all statements recounted by Inspector Lage as bases for his opinions could be

3  considered only to evaluate his opinions and could not be considered for the truth of the

4  information in the underlying statements.  A habeas court "must presume that the jury

5  followed its instructions . . . ."  Boyde v. Brown, 404 F.3d 1159, 1173 (9th Cir. 2005).

6  Thus, even if the trial court committed constitutional error in allowing Lage to testify

7  regarding the hearsay testimony he relied upon in forming his opinions, the recitation of

8  any hearsay statements was harmless.  See Pulido, 629 F.3d at 1012.

9  <center>*c)*   ***Confrontation Clause***</center>

10         Finally, the Court finds that Petitioner's related Confrontation Clause claim is

11  procedurally barred and otherwise fails on the merits.  The Confrontation Clause provides

12  that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted

13  with the witnesses against him."  U.S. Const., 6th Amend.  Here, the state appellate court

14  found that Petitioner waived any Confrontation Clause claim on the ground that his trial

15  counsel failed to make a contemporaneous objection to the disputed evidence.[8]  In a federal

16  habeas proceeding, a habeas petitioner's failure to comply with a state's contemporaneous

17  objection rule results in a procedural default that bars federal consideration of the claim,

18  unless the petitioner demonstrates both "cause" for his failure to raise the objection at trial

19  and actual "prejudice" accruing from the error.  See Coleman v. Thompson, 501 U.S. 722,

20  729-30 (1991); Cook v. Schriro, 538 F.3d 1000, 1025-26 (9th Cir. 2008) (absent a showing

21  of cause and prejudice, petitioner is barred from raising a claim on federal habeas review

22  where he failed to meet state's contemporaneous objection rule).

23         In order to show "cause" for a procedural default, Petitioner must show "that some

24  objective factor external to the defense impeded counsel's efforts to comply with the

25  State's procedural rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986).  In neither his

26  _____

27  [8] Petitioner concedes defense counsel's failure to make a contemporaneous objection
   on Confrontation Clause grounds, but asserts that her request for a limiting instruction
   regarding Inspector Lage's hearsay statements was tantamount to such an objection.

28  Traverse at 15.  Petitioner cites no authority for that proposition.

Petition nor traverse does Petitioner identify any such objective factor.  Rather, Petitioner summarily asserts it is "not clear" that the state appellate court decision rests upon a state law procedural bar.  Traverse at 15.  The Court disagrees.  The state appellate court expressly relied on California Evidence Code § 353.  See Rodriguez, 2009 WL 2993822, *20 ("Defendant did not expressly object on confrontation grounds prior to or at trial, so this argument is waived.") (citing Cal. Evid. Code § 353(a)).  Section 353 is California's contemporaneous objection rule.  See Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002).  Having failed to otherwise show cause or prejudice, the Court finds that Petitioner's claim that his rights under the Confrontation Clause were violated is procedurally barred.

Even assuming the claim is not defaulted, it fails on its merits.  The Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.  Williams v. Illinois, —U.S. —, 132 S.Ct. 2221, 2228 (2012).  The Williams court explained that:

> When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.

Id. (emphasis added).  Numerous federal courts have thus found that a gang expert's reliance on hearsay evidence does not violate the Confrontation Clause where, as here, the underlying hearsay is not admitted for the truth of the matter asserted, but rather to support the gang expert's opinion.  See Martin v. Lewis, No. 2:12-cv-1384 KJM DAD P2013 WL 3786863, *11 (E.D. Cal., Jul. 18, 2013) (listing cases).  Additionally, the fact that Inspector Lage testified and was available for cross-examination further undermines Petitioner's claim.  See United States v. Beltran-Rios, 878 F.2d 1208, 1213 & n.3 (9th Cir. 1989) (holding that expert's drug courier profile testimony, which was based in part upon information obtained from DEA officials, did not violate the confrontation clause, particularly where the expert witness was available for cross-examination).  Accordingly, the Court DENIES relief on Claim Three.

**E.      CERTIFICATE OF APPEALABILITY**

The federal rules governing habeas cases require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling.  See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  The Court declines to issue a COA in this case, as Petitioner has not demonstrated that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

## IV.      CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1.      The Petition for Writ of Habeas Corpus is DENIED.

2.      The Court declines to issue a COA.

3.      The Clerk shall close the file and terminate any pending matters.

IT IS SO ORDERED.

Dated: September 30, 2014

SAUNDRA BROWN ARMSTRONG
United States District Judge